# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION AT COLUMBIA

| | | |
|---|---|---|
| DERRON LEE, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO.: |
| | } | JURY TRIAL DEMANDED |
| REGIONS BANK, | } | |
| | } | |
| Defendant. | } | |

## COMPLAINT

**COMES NOW** the Plaintiff, DerRon Lee ("Plaintiff" or "Mr. Lee"), by and through undersigned counsel, Law Office of James W. Friauf, PLLC, and for his Complaint against Defendant Regions Bank ("Regions" or "Defendant") avers as follows:

## PARTIES

1.      Plaintiff DerRon Lee is an African-American resident citizen of the State of Tennessee, County of Maury. At all times material hereto, Plaintiff was the sole member of Property Valu-Razors, LLC, a real estate investment limited liability company specializing in neighborhood redevelopment.

2.      At all times material hereto, Regions Bank was a foreign, for-profit corporation organized pursuant to the laws of Alabama, which maintained its principal place of business in Birmingham, Alabama.

3.      At all times material hereto, Regions Bank was engaged in the banking industry and transacted business in the State of Tennessee, County of Williamson. Regions Bank's registered agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

1

3.      This action arises from Defendant's racial discrimination in violation of 42 U.S.C. § 1981. Accordingly, this Court has jurisdiction to adjudicate the matter. 28 U.S.C. § 1331.

4.      The remaining causes of action averred herein are so related to the claim within the original jurisdiction of this Court so as to form part of the same case or controversy.  Accordingly, the Court has supplemental jurisdiction to adjudicate Plaintiff's claims for breach of contract and intentional interference with business relations in violation of Tennessee common law. 28 U.S.C. § 1367.

5.      A substantial part of the events or omissions giving rise to this matter occurred in Williamson County, Tennessee. Accordingly, venue is proper. 28 U.S.C. § 1391(b)(2).

**GENERAL ALLEGATIONS**

6.      Plaintiff re-alleges and incorporates by reference each averment set forth in paragraphs 1-5 herein, inclusive.

7.      At all times material hereto, Plaintiff was an African-American male with dreadlocks.

8.      At all times material hereto, Plaintiff was the sole member of Property Valu-Razors, LLC ("Valu-Razors"), a real estate investment company specializing in neighborhood redevelopment.

9.      At all times material hereto, Plaintiff possessed a business checking account, a personal savings account, and a personal checking account at Regions Bank.

10.     At all times material hereto, Steve Stokeling ("Mr. Stokeling") was Plaintiff's business associate.

11.     In the spring of 2017, Plaintiff's was introduced at his very first real estate meeting in Columbia, Tennessee to Sara King ("Ms. King"), an elderly, Caucasian woman. Ms. King wanted to invest through Valu-Razors by providing funds to purchase real property in Atlanta, Georgia. Valu-Razors intended to purchase this property, rehabilitate it, and resell (or flip) the property for a profit. Part of the profit from this "flip" would constitute Ms. King's return on investment ("ROI").

12.     Ms. King was also a customer of Regions Bank.

13.     Pursuant to an oral contract with Plaintiff and Mr. Stokel, Ms. King agreed to invest Ten Thousand Dollars and 00/100 ($10,000.00) through Valu-Razors for the purchase and redevelopment of the real property in Atlanta, Georgia.

14.     Upon information and belief, the aforementioned business venture would have netted a profit of approximately Sixty Thousand Dollars and 00/100 ($60,000.00), thereby resulting in a Fifty Percent (50%) ROI for Ms. King.

15.     On or about May 1, 2017, Plaintiff went to Regions Bank in Spring Hill, Tennessee ("Regions Spring Hill"), for the purpose of cashing a check made payable to Plaintiff from Ms. King for the sum of Ten Thousand Dollars and 00/100 ($10,000.00).

16.     Plaintiff approached a Caucasian female teller and asked her to cash the check. The teller responded, "hold on a second." She then went to another Caucasian female teller and whispered something Plaintiff could not hear. Both tellers then looked up at Plaintiff. The first teller then returned to the counter where Plaintiff was waiting. She stated to Plaintiff, "I'm sorry. You have to take the check back to the maker. We cannot cash this check." Plaintiff replied, "What do you mean?" The teller again advised Plaintiff to take the check "back to the maker". Plaintiff, frustrated at this point, asked the teller if she could refer him to someone at the bank with whom he could speak with about the matter. In response, Plaintiff was directed to speak with branch vice president Lance Hayes ("Hayes"). Hayes is a Caucasian male.

17.     When Plaintiff spoke with Hayes, Hayes advised that Ms. King needed a bit more money in the bank account on which the check was drawn in order for Regions to cash the check. Hayes stated he was "pretty sure" the issued could be handled if Plaintiff contacted Ms. King. Plaintiff called Ms. King.

18.     In response to Plaintiff's telephone call, Ms. King came to Regions Spring Hill. Upon arrival, she went into Hayes' office with Plaintiff. She asked Hayes for clarification as to the issue with cashing the check she made payable to Plaintiff. To answer her question, Hayes turned his computer screen toward Ms.

3

King. Ms. King acknowledged what was on the computer screen and asked whether there were sufficient funds in her money market account. Hayes responded that this account had sufficient funds to complete the transaction.

19.     Hayes advised Ms. King she could transfer the correct amount from her money market account and open a joint bank account with Plaintiff to facilitate the transaction between the parties. By doing so, stated Hayes, "both of you would be on the account." Plaintiff objected and asked why Regions could not simply cash the check. Hayes responded that he might be able to cash "half the check"; however, the branch did not have sufficient funds to cover the full amount of the $10,000 check. Hayes stated he had other customers coming in to pick up cash, which is why he could not cash the full amount of Ms. King's check. Hayes said Plaintiff could cash half the check at the Regions Spring Hill branch and then go to another branch to get the other $5,000.

20.     During the meeting with Plaintiff and Ms. King, Hayes got up several times for the stated reason that he was checking with other branches on availability of funds. Each time he left, he would be gone five to ten minutes. Upon information and belief, Hayes was not contacting other bank branches. To the contrary, Hayes had obtained Plaintiff's personal information and was conducting a background check on Plaintiff without authorization.

21.     After it became clear Regions was not going to allow Plaintiff to cash Ms. King's check, reluctantly agreed to Hayes' proposal to open a joint bank account with Plaintiff. Upon information and belief, however, Ms. King did not realize Regions was closing her money market account as part of the transaction. Ms. King only have knowing consent for Regions to open a joint bank account with Plaintiff. She did not give knowing consent for Regions to close her money market account.

22.     Hayes then opened the joint bank account.

23.     After Hayes opened the joint bank account, Ms. King instructed Hayes to prepare a cashier's check payable to Plaintiff so he would have no difficulty facilitating the real estate transaction in Atlanta. After

4

giving this instruction to Hayes, Ms. King stated she did not want to be bothered any further about the issue and then went outside to sit in her car and smoke a cigarette.

24.     After Ms. King went outside, Hayes prepared a cashier's check payable to Ms. King for approximately $13,000, which, upon information and belief, was the entire balance of Ms. King's money market account.

25.     After preparing the cashier's check, Hayes stated to Plaintiff he (Hayes) needed to go outside to speak with Ms. King.

26.     After going outside, Hayes stated to Ms. King, "You may want to rethink giving this money to [Plaintiff]" - or words to that effect. Ms. King became irate. After some heated instructions by Ms. King to Hayes, Hayes reentered the bank.

27.     After walking back into the bank, Hayes handed Plaintiff the cashier's check and stated that the bank was closing soon.

28.     After Hayes gave Plaintiff the cashier's check, Ms. King reentered the bank. She asked Hayes why the cashier's check was payable in her name. Hayes could not provide a reason, stating simply, "It's as good as cash." Hayes reiterated that the bank was closing in the next few minutes.

29.     Plaintiff told Ms. King they could simply deposit the cashier's check in Plaintiff's business bank account with Ms. King's signature. To do this, Plaintiff and Ms. King went to the drive-thru window and gave the teller the signed cashier's check, Plaintiff's ID, and a deposit slip for Plaintiff's business bank account.

30.     After receiving these items, the teller (Caucasian female) placed the items on the counter and waited on eight or so other customers. After waiting for such a length of time at the window, Ms. King had to go to the restroom. Plaintiff asked Ms. King to get the check and finalize everything with the transaction while she was in the bank using the restroom.

5

31.     A few minutes after reentering the bank, Ms. King emerged stating that the bank employees were "racist bastards." - or words to that effect. Upon information and belief, while Ms. King was inside the bank, she was told the reason the bank would not process the transaction with Plaintiff was "for your protection." Plaintiff could hear Ms. King yelling, "protection my ass!!" as she left the bank.

32.     Previously, while Plaintiff and Ms. King were in the bank trying to complete their transaction, Ms. King had to (twice) go to the restroom. To open the restroom, Hayes had to unlock the door. Each time he did this for Ms. King, while the two were alone together in the hallway, Hayes asked Ms. King whether she was "being coerced [by Plaintiff]" - or words to that effect. Ms. King responded, "I know where you are trying to go with this. Just stop!"

33.     Upon information and belief, the Regions Bank's employees' statements to Ms. King (as set forth herein) were because Plaintiff is an African-American male with dreadlocks and Ms. King is an elderly Caucasian female. I.e., Regions' white employees thought Plaintiff, a black man with dreadlocks, was trying to coerce money from an elderly white woman.

34.     Approximately one week after Plaintiff and Ms. King were at Regions Spring Hill, Plaintiff received a letter from Defendant stating it had closed out all Plaintiff's bank accounts. business bank account due to "suspicious activity."

35.     Ms. King, who is Caucasian, never received such a letter and Regions never closed any of her bank accounts, despite the fact she was also a party to the attempted transactions with Plaintiff that, upon information and belief, resulted in Regions closing Plaintiff's bank account.

36.     After Plaintiff received the letter from Regions advising it had closed his bank accounts, Plaintiff's mother (who is also his business associate) contacted Regions requesting further information as to the reasons Regions closed Plaintiff's business bank account.

6

37. Plaintiff's mother spoke to an unknown employee of Defendant on the telephone. This employee assured Plaintiff's mother: (i) Plaintiff had received the letter in error; and (ii) Defendant would not be closing Plaintiff's business account.

38. As a result, Plaintiff went to Regions in Columbia (James Campbell Blvd) ("Regions Columbia") to verify the status of his business bank account.

39. Upon arriving at Regions Columbia, Plaintiff requested to speak to a banker.

40. The banker (a Caucasian female) initially assured Plaintiff that Defendant would not be closing Plaintiff's business bank account.

41. However, after making these assurances, Plaintiff asked the banker if she could go do a deeper check into his account. The banker then excused herself to somewhere out of Plaintiff's line of sight.

42. Upon returning with the branch manager (Caucasian male), the banker informed Plaintiff that Defendant would, in fact, be closing Plaintiff's business bank account "due to security concerns" – or words to that effect.

43. Upon information and belief, Defendant had "security concerns" because Plaintiff is an African-American male who attempted to conduct business with an elderly Caucasian woman.

44. Plaintiff informed the branch manager that the closure of his business account would effectively nullify a time-sensitive business venture in Atlanta, Georgia, and respectfully demanded the branch manager's supervisor contact Plaintiff to explain.

48. No one contacted Plaintiff.

49. Confused, Plaintiff contacted Defendant's corporate office.

50. The individual Plaintiff spoke to on the telephone informed him that someone from Regions Bank headquarters would be contacting Plaintiff to address his concerns.

51. Again, no one contacted Plaintiff.

52.     On or about May 11, 2017, a Caucasian male finally contacted Plaintiff as requested. The unknown supervisor informed Plaintiff that Defendant possessed (and intended to exercise) the right to close Plaintiff's business bank account for any reason. The unknown supervisor "consoled" Plaintiff by stating he had "counseled Hayes for being rude" – or words to that effect.

53.     Defendant ultimately closed Plaintiff's business, personal, and savings bank account.

54.     The closure of Plaintiff's business bank account by Regions prevented Plaintiff from executing his business venture in Atlanta, Georgia, and ultimately cost Plaintiff approximately Sixty Thousand Dollars and 00/100 ($60,000.00) in lost profits.

55.     In addition to lost profits, Defendant's decision to close Plaintiff's business bank account caused Plaintiff to miss several payments that would have been automatically withdrawn from the closed checking account.

56.     As a result, Plaintiff's credit score has suffered dramatically.

57.     Finally, due to Defendant's closure of Plaintiff's business bank account, Plaintiff is fearful to open another business account at a different institution due to the blatantly discriminatory actions of Regions Spring Hill.

58.     Accordingly, as a direct and proximate result of Defendant's actions, Plaintiff has suffered emotionally and financially and is entitled to the relief set forth more fully herein.

## COUNT I

### Race Discrimination:
*(42 U.S.C. § 1981)*

59.     Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-58 herein, inclusive.

60.     At all times material hereto, Plaintiff was an African-American male and, therefore, a member of a protected group.

61.     At all times material hereto, Ms. King was an elderly Caucasian female.

62.     At all times material hereto, the population of Spring Hill, Tennessee was approximately Eighty-Five point Two Percent (85.2%) Caucasian and Four point Six Percent (4.6%) African American.

63.     In the spring of 2017, Plaintiff entered into an oral contract with Ms. King whereby she agreed to invest Ten Thousand Dollars and 00/100 ($10,000.00) into Plaintiff's company in exchange for a fifty percent (50%) ROI following the sale of a remodeled home in Atlanta, Georgia.

64.     Defendant refused to honor Ms. King's requests to: (i) cash a check in the amount of Ten Thousand Dollars and 00/100 ($10,000.00) made payable to Plaintiff; (ii) prepare a cashier's check in the amount of Ten Thousand Dollars and 00/100 ($10,000.00) made payable to Plaintiff; or (iii) deposit a cashier's check drawn on Ms. King's money market account, which she signed, into Plaintiff's business bank account.

65.     While refusing to honor Ms. King's requests, Defendant's employees made statements such as: (1) "you may want to rethink giving this money to [Plaintiff]"; (2) "this is for your protection"; and (3) "are you being coerced [by Plaintiff]" – or words to that effect.

66.     Upon information and belief, Defendant believed Plaintiff was "coerc[ing]" Ms. King because Ms. King is an elderly Caucasian woman and Plaintiff is an African-American male with dreadlocks and would-be recipient of a Ten Thousand Dollar and 00/100 ($10,000.00) lump sum of money from Ms. King.

67.     The foregoing conduct constitutes intentional discrimination against Plaintiff on the basis of race.

68.     In protecting the right to make contracts, 42 U.S.C. § 1981 "proscribes not only discrimination by contracting party at contract-formation stage, but also discriminatory interference by third party with exercise of right to make contracts." *Kolb v. State of Ohio, Dept. of Mental Retardation and Developmental Disabilities, Cleveland Developmental Center*, 721 F. Supp. 885, 894 (N.D. Ohio, 1989); *Nieto v. United Auto Workers Local 598*, 672 F. Supp. 987, 989 (E.D. Mich. 1987) (citing *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975), cert. denied, 422 U.S. 1006 (1975)).

69.     Defendant's intentional discrimination on the basis of race "blocked the creation of a contractual relationship" and/or "impaired an existing contractual relationship" between Plaintiff and Ms. King. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006).

70.     Accordingly, as a direct and proximate result of Defendant's race discrimination, Defendant impaired an existing contractual relationship in that neither Plaintiff nor Ms. King were able to perform pursuant to their oral contract.

71.     Accordingly, Defendant's third-party interference with the aforementioned contract constitutes racial discrimination in violation of 42 U.S.C. § 1981.

72.     As a direct and proximate result of Defendant's race discrimination, Plaintiff has suffered injuries and damages and is entitled to the relief set forth more fully herein.

## COUNT II

Race Discrimination:
(*42 U.S.C. § 1981*)

73.     Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-72 herein, inclusive.

74.     By refusing to honor Ms. King's requests to: (i) cash a check in the amount of Ten Thousand Dollars and 00/100 ($10,000.00) made payable to Plaintiff; (ii) prepare a cashier's check in the amount of Ten Thousand Dollars and 00/100 ($10,000.00) made payable to Plaintiff; or (iii) deposit a cashier's check drawn on Ms. King's money market account, which she signed, into Plaintiff's business bank account, Defendant also "blocked the creation of a contractual relationship" and/or "impaired an existing contractual relationship" between Plaintiff and Mr. Stokeling and the seller of real property in Atlanta, Georgia.  *See id*.

75.     Accordingly, as a direct and proximate result of Defendant's race discrimination, Defendant blocked and/or impaired an existing contractual relationship in that Plaintiff was unable to perform pursuant to his existing contract with individual(s) in Atlanta, Georgia.

76. Defendant's third-party interference with the aforementioned contract constitutes race discrimination in violation of 42 U.S.C. § 1981.

77. As a direct and proximate result of Defendant's race discrimination, Plaintiff has suffered injuries and damages and is entitled to the relief set forth more fully herein.

## COUNT III

### Race Discrimination:
*(42 U.S.C. § 1981)*

78. Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-77 herein, inclusive.

79. After refusing to honor Ms. King's requests, Defendant made the executive decision to close Plaintiff's business bank account with Regions Spring Hill for the stated reason of "suspicious activity."

80. Upon information and belief, Defendant was "suspicious" of Plaintiff due to his status as a successful African-American entrepreneur.

81. Despite Ms. King's involvement in the "suspicious" transaction, Regions did not close Ms. King's bank account(s). Upon information and belief, this is because Ms. King is Caucasian.

82. Upon information and belief, at or about the time Defendant closed Plaintiff's business bank account, Defendant also reported the same to Paychex. This will inevitably impair Plaintiff's future ability to open financial accounts and/or transact business.

83. In the present age, Plaintiff is incapable of successfully operating Property Valu-Razors, LLC, without access to a business checking account.

84. By discriminating against Plaintiff and closing his business bank account, Defendant "blocked the creation of a contractual relationship" and/or "impaired an existing contractual relationship" between Plaintiff and present or future investors due to Plaintiff's inability to manage his business without an active business checking account with credit card reader linked. *See id.*

11

85.     As a direct and proximate result of Defendant's race discrimination, Defendant impaired and/or blocked Plaintiff's present and/or future contractual relationships through the closure of Plaintiff's business bank account.

86.     Defendant's third-party impairment of the aforementioned contract(s) constitutes race discrimination in violation of 42 U.S.C. § 1981.

87.     As a direct and proximate result of Defendant's race discrimination, Plaintiff has suffered injuries and damages and is entitled to the relief set forth more fully herein.

## COUNT IV

### Race Discrimination:
*(42 U.S.C. § 1981)*

88.     Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-87 herein, inclusive.

89.     Section 1981 prevents discrimination in the making and enforcement of private contracts, "including discriminatory contract terminations." *El-Hallani v. Huntington Nat. Bank*, 623 Fed. Appx. 730, 734 (6th Cir. 2015).

90.     Defendant closed Plaintiff's all of Plaintiffs bank accounts, without warning, for the stated reason of "suspicious activity."

91.     Such an explanation is not sufficient within the meaning of 42 U.S.C. § 1981.

92.     Accordingly, Defendant closed Plaintiff's business bank account without sufficient explanation, immediately following the Regions' white employees' racist-driven comments to Ms. King (who is Caucasian) such as, (1) "you may want to rethink giving this money to [Plaintiff]"; (2) "this is for your protection"; and (3) "are you being coerced [by Plaintiff]" – or words to that effect.

93.     Furthermore, despite the alleged existence of "suspicious activity," Defendant did not close any of Ms. King's bank accounts at Regions.

94.     Upon information and belief, Defendant did not close any of Ms. King's bank accounts because, unlike Plaintiff, Ms. King is Caucasian.

95.     By closing Plaintiff's business bank account, Defendant discriminated against Plaintiff on the basis of race through the termination of Plaintiff's contract with Regions Spring Hill.

96.     Defendant's discriminatory contract termination constitutes race discrimination in violation of 42 U.S.C. § 1981.

97.     As a direct and proximate result of Defendant's race discrimination, Plaintiff has suffered injuries and damages and is entitled to the relief set forth more fully herein

## COUNT V

### Breach of Contract
*(Tennessee common law)*

98.     Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-97 herein, inclusive.

99.     By opening a bank account with Regions, Plaintiff entered into an enforceable contract with Defendant.

100.    Accordingly, Defendant owed Plaintiff implied duties of good faith and fair dealing. *See Dick Broad. Co. v. Oak Ridge FM, Inc*., 395 S.W.3d 653, 660 (Tenn. 2013) (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)).

101.    By closing Plaintiff's business bank account absent sufficient explanation or warning, Defendant breached its duties of good faith and fair dealing, thereby failing to perform within Plaintiff's reasonable expectation as a party to the contract with Regions.

102.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has suffered the following damages and is entitled to the relief set forth more fully herein: (i) lost profits from the business venture in Atlanta, Georgia, amounting to approximately Sixty Thousand Dollars and 00/100 ($60,000.00);

13

(ii) several missed payments that would have automatically been withdrawn from the closed checking account; (iii) a dramatic credit score reduction; (iv) lost profits from future business ventures due to Plaintiff's inability to conduct business without an active business checking account; and (v) the inevitable and inescapable impairment of Plaintiff's future ability to open financial accounts and/or transact business as a direct and proximate result of Defendant's reporting to Paychex.

## COUNT VI

### Intentional Interference with Business Relations
*(Tennessee common law)*

103.    Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-102 herein, inclusive.

104.    At the time Defendant closed Plaintiff's business bank account (immediately following its refusal to cash Ms. King's investment check or otherwise provide the requested funds to Plaintiff), a business relationship (or expectancy) existed between Plaintiff, Ms. King, Mr. Stokeling, and real estate sellers in Atlanta.

105.    On or about May 1, 2017, Plaintiff explained the nature of this business relationship (or expectancy) in detail to Defendant via Hayes. Specifically, Plaintiff emphasized the time-sensitive nature of said relationship.

106.    Accordingly, Defendant had actual knowledge of the business relationship (or expectancy) between Plaintiff, Ms. King, Mr. Stokeling, and real estate investors/sellers in Atlanta.

107.    By closing Plaintiff's business bank account without warning, Defendant intentionally interfered with this business relationship (or expectancy).

108.    Proof of this interference is evidenced through: (i) Plaintiff's lack of a business bank account that he is able to accept credit card payments with Regions Spring Hill; (ii) Plaintiff's resulting failure to purchase the residential property in Atlanta, Georgia; and (iii) witness testimony from Ms. King and Mr.

14

Stokeling crediting Defendant's closure of Plaintiff's business bank account following its refusal to cash Ms. King's investment check or otherwise assist in transferring funds from Ms. King to Plaintiff as the sole cause of the parties' failed business venture.

109.    As a direct and proximate result of Defendant's actions, Plaintiff was unable to perform his obligations pursuant to his oral contracts with Ms. King, Mr. Stokeling, and the property sellers in Atlanta, Georgia, which ultimately resulted in lost profits amounting to approximately Sixty Thousand Dollars and 00/100 ($60,000.00).

110.    The foregoing conduct constitutes intentional interference with business relations in violation of Tennessee common law.

111.    As a direct and proximate result of Defendant's intentional interference with Plaintiff's business relations, Plaintiff has suffered injuries and damages and is entitled to the relief set forth more fully herein.

## DAMAGES

112.    Plaintiff re-alleges and incorporates by reference each averment of paragraphs 1-111 herein, inclusive.

113.    As a direct and proximate result of each one of the foregoing acts, conduct, and violations of the law as alleged herein, Plaintiff has suffered damages in an amount and according to proof, including, without limitation, lost earnings, lost future earnings, loss of business relationships, loss of future business relationships, actual monetary loss, physical and mental pain and suffering, embarrassment, humiliation, inconvenience, and other incidental and consequential damages.

115.    Plaintiff is entitled to, and seeks, recovery of his reasonable attorneys' fees and costs pursuant to 42 U.S.C. 1988(b).

116.    Plaintiff seeks an award of pre- and post-judgment interest as permitted by law.

117.    Defendant's conduct was malicious, willful, wanton and/or reckless so as to support an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1.    Compensatory damages in an amount to be awarded by a jury, not less than ONE MILLION DOLLARS AND 00/100 ($1,000,000.00).

2.    Punitive damages in an amount to be awarded by a jury, not less than FIVE MILLION DOLLARS AND 00/100 ($5,000,000.00).

3.    Reasonable attorneys' fees and costs;

4.    Incidental and/or consequential damages in an amount to be determined by a jury; and

5.    Any and all further relief this Honorable Court deems just and appropriate.

**WHEREFORE**, Plaintiff also prays for the reinstatement of his business checking account at Regions Spring Hill and the withdrawal of any report made to Paychex.

Respectfully submitted, this 11th day of September 2017.

**DERRON LEE**

By:  /s/ James W. Friauf
James W. Friauf (#027238)
LAW OFFICE OF JAMES W. FRIAUF, PLLC
9724 Kingston Pike, Suite 104
Knoxville, Tennessee 37922
Tele: (865) 236-0347
Fax: (865) 512-9174
Email: james@friauflaw.com
Our File No.: 17-117-CIV

*Attorney for Plaintiff, DerRon Lee*